IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANN MARIE MUZZARELLI,       ) | |
|                               ) | |
|         Plaintiff,       ) | |
|                               ) | No. 10 C 7570 |
| vs.                           ) | |
|                               ) | Magistrate Judge Sidney I. Schenkier |
|                               ) | |
| MICHAEL J. ASTRUE, Commissioner   ) | |
| of Social Security,                ) | |
|                               ) | |
|         Defendant.      ) | |

### MEMORANDUM OPINION AND ORDER[1]

In this social security disability insurance appeal, plaintiff Ann Marie Muzzarelli moves for summary judgment or, in the alternative, remand of a final decision by the Commissioner of the Social Security Administration ("SSA"), pursuant to 42 U.S.C. § 405(g) (doc. #20). The Commissioner has filed a cross-motion for summary judgment to affirm the decision rejecting Ms. Muzzarelli's claim for Disability Insurance Benefits ("DIB") (doc. #25). For the reasons set forth below, both the Commissioner's motion is denied, and Ms. Muzzarelli's motion is granted in part and denied in part.

### I.

Ms. Muzzarelli applied for DIB on May 6, 2008, alleging that she had been disabled as of January 17, 2008 due to degenerative and discogenic disorders of the spine (R. 120, 177). Her application was denied initially on July 2, 2008 and again upon reconsideration on September 3, 2008 (R. 126, 134). On October 16, 2008, she filed a timely request for a hearing by an

---

[1] On March 28, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 12, 14).

Administrative Law Judge ("ALJ") (R. 135). The request was granted, and on September 11, 2009 a hearing was held before an ALJ (R. 64). She was represented at the hearing by counsel, and the ALJ heard from Ms. Muzzarelli as well as vocational expert ("VE") Rueben Luna and medical expert ("ME") Dr. Hugh Savage (*id.*).

On September 29, 2009, the ALJ issued a written decision denying Ms. Muzzarelli's application for DIB, finding that she had failed to show that she was disabled under § 216(i) or § 223(d) of the Social Security Act ("Act") (R. 14-35). *See* 42 U.S.C. §§ 416(i) & 423(d). Ms. Muzzarelli subsequently appealed the ALJ's decision to the SSA's Appeals Council on November 3, 2009 (R. 10). The Appeals Council denied the request for review on September 28, 2010, and the ALJ's decision became the final decision of the Commissioner (R. 1). *See* 42 U.S.C. § 405(g); *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

II.

We begin with a summary of the medical record and then proceed to consider the hearing testimony given by Ms. Muzzarelli, the medical expert, and the vocational expert, as well as the ALJ's written decision.

A.

Ms. Muzzarelli was born on November 10, 1960 and was forty-eight years old at the time of the hearing (R. 177). As such, she was a "younger person" under the regulations whose age is not ordinarily considered a factor in adjusting to other work. 20 C.F.R. § 404.1563(c). Married and the mother of three children, Ms. Muzzarelli had worked almost continually during the fifteen year period preceding her onset date of January 17, 2008. From September 1995 through January 1998, she worked as a cashier in a grocery store, and from September 1998 through May 2002, Ms.

2

Muzzarelli was an office clerk for the city of Brightwood, Illinois (R. 93, 199). As a clerk, she assisted attorneys and city officials with the internal affairs of various city departments, answered questions posed by residents, and provided some research work for the city (R. 201). Ms. Muzzarelli had earlier attended college for two years, and from September 2002 to her onset date, she worked as a teacher's assistant for the Troy Community School District (R. 71, 199). Working primarily with disabled pre-school children, Ms. Muzzarelli helped teachers unload the children from buses, lifted them as part of various activities both inside and outside the classroom, and pulled children in wagons as part of their sensory break (R. 204). She also assisted teachers in helping students with academic and recreational activities. This work involved frequent stooping, bending, and carrying of heavy objects such as bicycles and gym equipment (R. 92, 204).

On October 14, 2007, Ms. Muzzarelli suffered acute back pain while bending over at home to load laundry into her washing machine (R. 104, 330, 391). The record contains little information concerning the onset of her pain, but Ms. Muzzarelli visited the Morris Hospital Emergency Room as soon as her symptoms began (R. 307). An x-ray taken there indicated a normal lumbar and thoracic spine, with some possible density over the lower vertebral bodies (R. 317-18). The emergency room physician diagnosed her with a lumbar sprain and administered morphine to relieve her immediate distress (R. 309, 313). Ms. Muzzarelli was given prescriptions for Valium and Vicodin, instructed to see an orthopedist, and released (R. 310).

She followed up with these instructions the following day with Dr. Michael Murphy, an orthopedic surgeon at Community Orthopedics in Joliet, Illinois, who ordered an MRI of Ms. Muzzarelli's lower spine. The MRI indicated that she suffered from a small paracentral protrusion at L4-L5 and had mild degenerative facet changes at L5-S1 (R. 325). Dr. Murphy noted that Ms.

Muzzarelli showed significant discomfort, with spasms in her lower back and pain radiating through her left leg (R. 323). She also showed a marked limitation in the ability to move her neck. Dr. Murphy diagnosed a herniated nucleus propulsus and added the pain medications Norco and OxyContin, as well as Medrol, to the prescriptions that had been prescribed at the emergency room the previous day (R. 323).

For reasons that are not clear, Ms. Muzzarelli followed up two days later, not with Dr. Murphy, but with Dr. Samir Sharma, an orthopedist with the Pain & Spine Institute in Joliet. This started a treatment relationship that encompassed twenty-nine visits extending from October 17, 2007 through Ms. Muzzarelli's last consultation on February 9, 2009. Dr. Sharma did not provide any direct treatment at the initial visit, but his notes show that Ms. Muzzarelli had tenderness of the left lumbar and sacral paraspinal muscles. However, a neurologic examination of her lower back was normal, and she showed muscle strength of five out of five for all tests on her left and right legs (R. 331).[2] Dr. Sharma diagnosed low back pain and lumbar radiculopathy and continued her on her current medication regime (R. 331).

Five days later, Ms. Muzzarelli returned to receive the first of three facet joint injections at the L2-3, L3-4, L4-5, and L5-S1 locations. Dr. Sharma performed these initial injections to help relieve Ms. Muzzarelli's lower back pain on October 22, November 2, and November 16, 2007 (R. 332, 337, 340). The injections were helpful, at least to some degree, and Ms. Muzzarelli reported

---

[2] The same results are shown for large portions of Dr. Sharma's treatment notes. As Dr. Savage pointed out at the hearing, Dr. Sharma's records were made electronically and include significant repetition of some information that could not have been entered anew at each individual consultation. For example, notes for Ms. Muzzarelli's last visit on February 9, 2009 still contain the same description of her condition that was entered on the first visit of October 17, 2007, stating that "the current episode of pain started 3 days ago" (R 460). As a result, it is not clear from the treatment notes if the five out of five muscle-strength assessment made on the first visit applies throughout Ms. Muzzarelli's entire period of care with Dr. Sharma, though it continues to appear on virtually all the physician's notes.

4

a forty percent reduction of her pain on a follow-up visit for the first injection, and a fifty percent reduction for the second and third treatments (R. 335, 337, 343). Dr. Sharma also prescribed a lumbar brace for her to wear (R. 345).

Unfortunately, these treatments were insufficient to alleviate Ms. Muzzarelli's complaints of lower back pain completely. Dr. Sharma then began a series of radiofrequency ablations of the medial branch nerves from the L2 through the S1 joints (R. 345). These procedures were designed to relieve lower back pain by applying heat generated by radio waves to the nerves. *See* http://www.mayoclinic.org/ablation/types. Ms. Muzzarelli reported a fifty percent reduction in pain for the first treatment, which took place on December 28, 2007, and similar ablations were carried out on January 18, March 31, and April 28, 2008 (R. 345, 349, 367, 374). During intervening visits, Dr. Sharma carried out sacro-illiac joint steroid injections on February 5, and February 19, and again on March 10, 2008 (R. 356, 359, 364). As with the earlier facet joint injections, Ms. Muzzarelli reported "significant" relief from some of the steroid injections and a fifty percent improvement from the ablations (R. 354, 358, 370, 377). Dr. Sharma supplemented her medications with prescriptions for the muscle relaxant Flexeril and the anti-inflammatory Flector, used as a patch, later substituting it with a patch for Lidoderm (R. 374, 381). Despite the fact that Ms. Muzzarelli began experiencing new symptoms of tingling sensations in her lower limbs, Dr. Sharma concluded on May 21, 2008 that she was showing "good results" (R. 377). He did indicate, however, that she might require surgery in the future (R. 377). At that time, Dr. Sharma referred Ms. Muzzarelli for water therapy and asked her to return again in three weeks (R. 379).

Ms. Muzzarelli followed through with Dr. Sharma's therapy recommendation at the Provena Saint Joseph Medical Center. On her initial evaluation, she stated that her lower back pain was a

seven out of ten, and she exhibited severe tenderness at the S1 joint and severe to moderate pain along the L3-L5 spinal segment. Her range of motion was limited to fifty-five percent on forward bends, twenty-five percent on backward bends, and seventy percent on moving side-to-side, all with accompanying pain (R. 391). Based on these evaluations, Ms. Muzzarelli's therapist set her a three-week goal at improving her pain level to a three out of ten, increasing her ability to stand and walk without pain to one hour, and enabling her to sit for up to one-and-a-half hours (R. 392). Each of the ten therapy notes indicates that Ms. Muzzarelli tolerated the aquatic therapy "well," and Dr. Sharma noted on June 11, 2008 that she was "doing good" with it (R. 380, 388-90). Ms. Muzzarelli disagreed with these evaluations, testifying instead at the hearing that the therapy made her feel worse (R. 78). In any event, the therapy was discontinued in July 2008, when her insurance company denied coverage for it.[3]

Numerous recommendations followed the termination of Ms. Muzzarelli's therapy. Dr. Sharma's notes indicate that he ordered a small fiber nerve conduction study, though the test results are not included in his treatment notes (R. 420). Dr. Sharma also ordered a CT scan of Ms. Muzzarelli's lumbar spine when she complained of increased pain on August 7, 2008. The scan report indicated that she was suffering from disc bulges at L3-L4 and L4-L5, moderate foraminal narrowing, mild central canal narrowing, and annular tears of various grades at L2-L3, L3-L4, L4-L5, and L5-S1 (R. 426). Dr. Sharma was concerned about these results and told Ms. Muzzarelli on August 14, 2008 that she was a candidate for bicuplasty, a minimally invasive procedure in which

---

[3] Dr. Sharma's treatment notes continue to include referrals to water therapy, though as with the presenting information discussed above, his notes may contain electronically-repeated statements that were not newly entered for each subsequent visit. Ms. Muzzarelli did not indicate at the hearing that her therapy continued after the insurance company denied coverage (R. 416).

6

two cooled radiofrequency probes are positioned bilaterally in the spinal disc to relieve pain. *See* http://www.ncbi.hlm.nih.gov/pubmed/18254768. Ms. Muzzarelli initially declined the procedure, though she appears to have changed her mind by later requesting coverage for it from her insurance company (R. 424). The request was eventually denied despite letters from Dr. Sharma outlining her need for the procedure (R. 449, 451).

Ms. Muzzarelli was unwilling to have any invasive surgery despite her complaints of increased numbness (R. 487). Nevertheless, Dr. Sharma noted on September 10, 2008 that she was "overall doing well" and later recommended that she begin back-strengthening exercises and avoid lifting more than twenty pounds (R. 487, 489). Her medications had been reduced to only Flexeril and OxyContin, and Dr. Sharma noted on October 8, 2008 that she was "stable" on these drugs "without side effects" (R. 484). By November 5, 2008, however, Norco was again added to her medications because Ms. Muzzarelli was once more experiencing increased pain (R. 483). Steroid injections were administered on three occasions during November and December 2008, and although she reported a thirty percent improvement in the level of her pain, Dr. Sharma's notes during this period report Ms. Muzzarelli's complaints of worsening pain on some visits and improvement on others (R. 467, 471).

On December 10, 2008, Dr. Sharma referred Ms. Muzzarelli to neurosurgeon Dr. George DePhillips for a neurological consultation. Dr. DePhillips reviewed her MRI and CT scan results and concluded that Ms. Muzzarelli's best option was to have bicuplasty or intradiscal electrothermic therapy ("IDET"), which uses heat to destroy nerve fibers and strengthen the outer layer of the disc (R. 455). *See* http://www.webmd.com/back-pain/intradiscal-electrothermic.com. Barring that, Dr. DePhillips concluded that she would have to consider a multiple-level spinal fusion (R. 455). The

record does not indicate either Ms. Muzzarelli's or Dr. Sharma's reaction to this recommendation, but Ms. Muzzarelli saw Dr. Sharma only twice in 2009 before terminating treatment with him. On her final visit on February 9, 2009, Dr. Sharma added Percocet to her medications and recommended that she undergo a spinal cord stimulation, which uses an implanted pulse generator to interfere with nerve impulses (R. 463). *See* http://www.webmd.com/back-pain/spinal-cord-stimulation-for-low-back-pain.

After ending her treatment with Dr. Sharma, Ms. Muzzarelli began to see a number of other physicians. Her family physician, Dr. Steven Nemeth, referred her on May 1, 2009 to orthopedic surgeon Dr. Eugene Kuo.[4] Dr. Kuo noted that Ms. Muzzarelli was continuing to use Percocet and OxyContin but had recently stopped using the Flexor and Lidoderm patches. Dr. Kuo further stated that Ms. Muzzarelli had cut back on many of her other medications, denied any true radiculopathy, and was walking two miles a day (R. 511). She showed flexion between forty and fifty degrees, mild sacroiliac tenderness, and a strength of five out of five from L1 to S1 bilaterally (R. 512). After reviewing her records, Dr. Kuo concluded that Ms. Muzzarelli suffered from a "complex problem" and disagreed with Dr. Sharma's recommendation that she use a spinal cord simulator. He also found that she was not a good candidate for spinal fusion therapy. Instead, Dr. Kuo recommended that Ms. Muzzarelli wean herself off narcotic medications and replace them with the anti-inflammatory Mobic and further physical therapy to control her pain (R. 513, 516).

On May 11, 2009, Dr. Nemeth also referred Ms. Muzzarelli to spine specialist Dr. Cary Templin. Dr. Templin noted that she was taking both Mobic and Lyrica and that her pain level was

---

[4] Ms. Muzzarelli informs us that Dr. Kuo has subsequently changed his name to Rebecca. For the sake of clarity, the third-person masculine pronoun is used herein to refer to Dr. Kuo.

a five out of ten. She was also complaining of new neck pain (R. 493). Like Dr. Kuo, Dr. Templin also concluded that Ms. Muzzarelli was not a good candidate for spinal fusion in light of the CT scan and the absence of any neural compression. He also disagreed with the recommendation of an IDET procedure and concurred with Dr. Kuo that her best options were to continue with therapy and to decrease the use of pain medications (R. 494).

Ms. Muzzarelli took the advice of Drs. Kuo and Templin and began reducing her use of narcotics. She had done so completely by May 22, 2009. Dr. Kuo's treatment note that day stated that her back pain was actually slightly better than it had been on the medication and that she had somewhat less tenderness to the touch on her physical examination (R. 499). Discomfort in her hands, however, led Dr. Kuo to think that Ms. Muzzarelli might have carpal tunnel syndrome. Accordingly, he referred her to Dr. Jason Franklin for an EMG nerve conduction study, which showed that she was, in fact, suffering from a mild carpal tunnel disorder as well as left-elbow pain (R. 497-98). In the last orthopedic treatment note in the record, Dr. Kuo stated that Ms. Muzzarelli was doing "well" even though she rated her pain as a five or six out of ten (R. 509).

Finally, the medical record also contains five unsigned entries that the ALJ identified as treatment notes from Ms. Muzzarelli's family physician, Dr. Steven Nemeth. Dr. Nemeth noted on June 23, 2009 that Ms. Muzzarelli's back pain had not improved and that she was "disabled" (R. 508). He reiterated the same opinion on July 16, 2009 by noting that she suffered from "severe osteoarthritis" of the spine – a diagnosis that no other physician reached (R. 507). Dr. Nemeth also issued a "To Whom It May Concern" letter the same day stating that Ms. Muzzarelli was "totally disabled and unable to work" due to her arthritis and degenerative disc disease but that she was too young to have a laminectomy and spinal fusion to correct the problem (R. 506).

**B.**

Ms. Muzzarelli testified at the hearing that her physicians advised her to take a leave of absence from work as soon as she injured her back in October 2007 (R. 73).[5] She loved working with disabled children, however, even though they could be physically aggressive at times (R. 92). But she felt obligated to resign on January 17, 2008, when her pain became so intense on her drive to work that she was forced to stop three times in order to vomit (R. 73). Her pain levels have not been significantly improved by any therapy or medication since that time, she stated. Her medications, which at the time of the hearing included Cymbalta, Lyrica, Mobic, and Ultracet, as well as an occasional Lidoderm patch, bring the lower back pain down to a level of seven or eight out of ten; without medication, Ms. Muzzarelli rated her pain as an eleven out of ten (R. 76). The pain in her wrists caused by carpal tunnel syndrome was a six out of ten (R. 75). Although the medications help her pain to some degree, the pain never goes away entirely (R. 75-76).

Ms. Muzzarelli also testified that her medications cause side effects such as nausea and fatigue that make it more difficult for her to remain alert (R. 76). Like the medications, Ms. Muzzarelli stated that the various treatments she received since her onset date had also not been significantly helpful. The various facet injections helped only "minimally," but she continued to receive them in the hope that they would eventually make a difference and because her doctor was also changing her oral medication from time to time (R. 94-95). As noted earlier, she stated that physical therapy gave rise to greater discomfort and that she stopped because her husband's insurance no longer covered it (R. 78-79).

---

[5] The reports issued in October 2007 by Dr. Murphy and Dr. Sharma do not indicate such a recommendation (R. 323, 330-36).

10

Ms. Muzzarelli described her lower back pain as more severe on the left side than the right and stated that it radiates on the left side down through her foot and heel. On the right side, it only extends as far as the knee (R. 75). She also suffers from pain in her neck that extends into her shoulders and arms and causes a numbing sensation in her fingers (R. 74). In addition to medication, she tries to control her pain with a combination of ice, home-based physical therapy, and the use of a transcutaneous electrical nerve simulator ("TENS unit"), which stimulates nerve endings for therapeutic purposes. Ms. Muzzarelli stated that the TENS unit helps control her pain, and she uses it on a daily basis (R. 79-80). She also uses ice on her back and hands throughout the day (R. 79, 95).

Ms. Muzzarelli testified that her lower back problem had reduced her former activities to a "very, very minimal" level (R. 95). Instead of cooking and entertaining, she is unable to bend, squat, or lift and, as a result, cannot prepare anything more than light meals such as salads for her family (R. 89, 95). Her husband and children do the family laundry, and her husband does all the yard work (R. 87, 96). Her family also does most household activities such as vacuuming and making the beds, though she accompanies them in grocery shopping by hanging onto the cart as they walk through the store (R. 89-90). Ms. Muzzarelli stated that she has been required to give up former activities that she enjoyed and has had to reduce hobbies such as sewing and scrapbooking to things she only does two or three times a year (R. 87). Mobility, both within and outside the home, poses particular difficulties for her, according to Ms. Muzzarelli. She is able to drive only under emergency conditions, though she has an active driver's license, and is unable to attend athletic events that her three children are involved in (R. 86, 88). Dressing herself is difficult, and when she comes

11

downstairs in the morning from her second-story bedroom, Ms. Muzzarelli must take with her the things she will need for the day because walking back up the stairs is challenging (R. 82, 91).

Accordingly, Ms. Muzzarelli described her typical day as a "lot of clock watching" in which she keeps close track of time both in order to take her medication in a timely manner and to make sure that family members are available to keep the household running smoothly (R. 91). She reads the news on her computer, though she can only understand articles "sometimes" (R. 84). She also reads novels but can only do so for short periods due to pain and an inability to concentrate (R. 90). Ms. Muzzarelli stated that pain requires her to change positions every ten to fifteen minutes when she is seated (R. 84). Sitting, reaching, and squatting are painful for her, and she can lift only eight to ten pounds at a time (R. 73). Ms. Muzzarelli testified that she can sit or stand only five to ten minutes before experiencing pain radiating through both legs and that she has been able to walk only one block at a time since January 2007 (R. 80-82).[6]

## C.

Also present at the hearing was the medical expert ("ME") Dr. Hugh Savage, who is board certified in internal medicine and cardiovascular disease. Dr. Savage stated that Ms. Muzzarelli had a number of medical impairments, including (1) lumbar radiculopathy, (2) epicondylitis or "tennis elbow," (3) bilateral carpal tunnel syndrome, (4) degenerative joint disease of the spine that included degenerative facet changes, a right paracentral disc protrusion, and a fifty percent loss of disc height

---

[6] Ms. Muzzarelli's testimony on this issue was not entirely clear. After stating that she had been limited to walking a single block since January 2007, she agreed with the ALJ that she had been walking two miles at a time but had stopped doing so in the spring of 2008 (R. 81-82). Dr. Kuo's May 1, 2009 treatment note stated that she was walking two miles a day as of that date (R. 511).

at L5-S1, and (5) an adjustment disorder with depressed mood.[7]  Dr. Savage testified that Ms. Muzzarelli did not meet Listing 1.04, which addresses disorders of the spine and includes Part A, Part B, and Part C criteria.  According to the ME, she did not meet the requirements of Part A of the Listing because the medical record did not indicate that Ms. Muzzarelli suffered from any motor loss with atrophy, any sensory or reflex loss, and never had a straight-leg raising test, which Part A requires to be done in both a sitting and a supine position (R. 105).  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A).  Listing 1.04 also requires a claimant to meet one of two additional criteria set forth in Parts B and C.  Dr. Savage concluded that Ms. Muzzarelli did not meet Part B because no operative procedure confirmed that she suffered from spina arachnoiditis, an inflammation of membranes surrounding nerves in the spinal cord (R. 105-06).  Ms. Muzzarelli also did not meet the requirements of Part C because she did not show signs of lumbar spinal stenosis resulting in pseudoclaudication, a disorder that Dr. Savage explained involved limping that was not caused by vascular disease (R. 106).

The ME stated that no state consultative examination had been carried out and that no medical evidence supported Dr. Nemeth's conclusion that Ms. Muzzarelli was "a total invalid" (R. 106, 108).  He determined that some limitations clearly existed but that there were discrepancies between Ms. Muzzarelli's testimony and the medical record.  Dr. Savage briefly questioned Ms. Muzzarelli concerning her functioning after she stopped taking narcotic pain medications.  She told

---

[7] The statement concerning Ms. Muzzarelli's purported psychological impairment was based on Dr. Savage's misreading of Dr. Templin's treatment note.  The ME interpreted Dr. Templin's note as including a referral to a psychiatrist for help with myofascial-related pain syndrome, a condition that Dr. Savage concluded had a psychological dimension for Ms. Muzzarelli (R. 101).  In reality, Dr. Templin referred Ms. Muzzarelli to a physiatrist – a physician specializing in physical medicine and rehabilitation – for help with possible myofascial pain (R. 494).  Dr. Templin made no reference to a mood disorder and did not attribute any of Ms. Muzzarelli's pain to psychological causes.  Ms. Muzzarelli herself testified that did not suffer from any psychological problems (R. 79).

the ME that her symptoms became worse after doing so, but Dr. Savage pointed out that Dr. Kuo had noted that she had reported the opposite to him (R. 98, 107).

Dr. Savage concluded that Ms. Muzzarelli had pain-related limitations and that her work capacity would vary from a sedentary exertional level on a bad day to a light work level on a good day. She could lift ten pounds frequently and would need a sit/stand option every one to two hours (R. 107). On better days she would be able to sit and stand for six out of eight hours, but on worse days she could only do so for four hours. No environmental factors were noted, but Ms. Muzzarelli would be precluded from any unprotected heights, ladders, ropes, or scaffolds (R. 107). She could crawl only partially, kneel occasionally, and could bend only up to thirty degrees (R. 109-110). Although climbing stairs could be difficult for her, the ME found that Ms. Muzzarelli could do so occasionally with the help of a stair rail (R. 109-110). The only restriction found to stem from Ms. Muzzarelli's carpal tunnel syndrome was that she could frequently, but not constantly, move her hands (R. 111). Dr. Savage did not find that elbow pain imposed any limitations on her functioning.

The ALJ then posed three hypothetical questions to the VE, Rueben Luna. Asked to assume that Ms. Muzzarelli could undertake a full range of light work, Mr. Luna stated that she could perform her past jobs as an office clerk and a teacher's aide, as well as a dispatcher, a mail sorter, and a gate guard (R. 113-14). Significant numbers of jobs for the last three categories exist in the Chicago area (R. 114). The ALJ then asked Mr. Luna to assume that Ms. Muzzarelli were limited to a sedentary level with the limitations Dr. Savage stated would be present on one of her worst days. The ALJ described these limitations to the VE as the ability to sit for up to six hours and to stand for four hours. Mr. Luna concluded that she would not be able to perform any of her past relevant work under this scenario but that she could still function as a dispatcher, surveillance system monitor, or

order clerk (R. 115-16). Finally, assuming that Ms. Muzzarelli's testimony were entirely credible, Mr. Luna stated that she could still perform the job duties of a surveillance systems monitor and dispatcher (R. 116). On further questioning, Mr. Luna conceded that if Ms. Muzzarelli were unable to stay alert throughout her shift, she would be disqualified as a dispatcher and could be a surveillance monitor only with the assistance of another person (R. 116-17).

## D.

Based on the testimony at the hearing and the medical record, the ALJ issued an unusually lengthy (twenty-two page) decision on September 29, 2009, finding that Ms. Muzzarelli was not disabled (R. 14-35). The ALJ found at Step 1 that Ms. Muzzarelli had not engaged in substantial gainful activity since her onset date of January 17, 2008 (R. 16). The ALJ then proceeded to Step 2, where he determined that she suffered from the severe impairments of degenerative disc disease, lumbar radiculopathy, and carpal tunnel syndrome (R. 16). He did not review the medical record in detail at this stage in support of those specific findings, focusing instead on medical evidence that he believed supported a conclusion that Ms. Muzzarelli's tennis elbow and mental functioning were not severe impairments. The ALJ noted that Dr. Kuo had recommended physical therapy and a counterforce brace to treat her elbow pain. He also stated that Dr. Savage had testified at the hearing that, in light of the full muscle strength she showed upon examination for her condition, Ms. Muzzarelli's elbow pain was not severe for purposes of the five-step evaluation process (R. 17).

The ALJ considered evidence related to Ms. Muzzarelli's mental functioning in detail at Step 2. He noted that she had never sought treatment for a mental impairment and only testified to what the ALJ interpreted as mild limitations (R. 17). Ms. Muzzarelli had stated that her activities of daily living were significantly limited, but the ALJ concluded that such limitations stemmed from pain,

not from a mental impairment. The ALJ stated that her testimony on these topics primarily concerned symptoms, such as drowsiness and mental fogginess, allegedly resulting from the side effects of her medication. He concluded that this conflicted with Ms. Muzzarelli's statements to her physicians, who "repeatedly reflect that the claimant was in no apparent distress, was stable on medication, and denied any side effects" (R. 17). Based on the absence of supporting medical reports and evidence indicating episodes of decompensation, the ALJ found that Ms. Muzzarelli's allegations did not meet the criteria in Paragraph B of Listing 12.00C, which are used to evaluate the severity of a mental disorder (R. 18). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C; *see also* SSR 96-8p (stating that both Paragraph B and C criteria are used to rate the severity of a mental impairment at Steps 2 and 3).[8] He found that she suffered from a non-severe mental impairment with mild limitations in the functional areas of activities of daily living, social functioning, and concentration (R. 17-18).

The ALJ next found at Step 3 that Ms. Muzzarelli's severe impairments did not meet or medically equal a listed impairment in Appendix 1 of the regulations. Relying on Dr. Savage's testimony, the ALJ remarked that Ms. Muzzarelli had normal motor and sensory functioning, full limb strength, and no weakness that would be consistent with supine or standing positive straight leg raises, as required by Listing 1.04 for a spine disorder (R. 19). Listing 1.04(A), concerning nerve root compression, was not met, and Ms. Muzzarelli had not had a confirming surgery as required to find spinal arachnoiditis under Listing 1.04(B). Listing 1.04(C), which describes lumbar spinal stenosis, was not supported by either weakness or limping (R. 19).

---

[8] Social Security Rulings are published quarterly and are binding on all parts of the SSA. They do not have the force of law, but they "are to be relied upon as precedents in determining other cases where the facts are basically the same." *Lauer v. Bowen*, 818 F.2d 636, 640 n.9 (7th Cir. 1987).

Before moving to Step 4, the ALJ determined that Ms. Muzzarelli had the residual functional capacity ("RFC") to perform a reduced range of light work and could lift only ten pounds occasionally. In so doing, the ALJ gave no weight to Dr. Nemeth's opinion that she was disabled and also gave "little weight" to the opinions of two state agency RFC findings in the record.[9] The ALJ found that Ms. Muzzarelli was able to sit for four hours and stand for six but needed a sit/stand option that would allow her to sit or stand at will for five minutes each hour (R. 19). She could climb stairs with a hand rail, kneel occasionally, and stoop up to thirty degrees. In spite of her carpal tunnel syndrome, the ALJ concluded that she could also frequently perform fine and gross manipulation with both hands (R. 19). In reaching this decision, the ALJ concluded that Ms. Muzzarelli's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible for the reasons explained more fully below (R. 22).

Based on this RFC finding, the ALJ determined at Step 4 that Ms. Muzzarelli could not undertake any of her past relevant work (R. 33). At Step 5, however, he found that the VE's testimony showed that a significant number of jobs exist in the national economy that she could perform (R. 33). As a result, the ALJ concluded that she had not been under a disability since January 17, 2008 (R.34).

### III.

We begin our analysis with an overview of the relevant legal standards governing appeals from the Commissioner's final decisions. To establish disability under the Act, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically

---

[9] A June 6, 2008 unsigned assessment concluded that Ms. Muzzarelli had "a light RFC with several postural limitations to occasional" (R. 396). On July 2, 2008, Dr. Richard Bilinsky determined that her subjective allegations were only partially credible and adopted the earlier RFC assessment (R. 447).

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity includes work of the type a claimant did before the impairment or any other kind of gainful work generally available in the national economy. *Id.*

The social security regulations set forth a five-step analysis for determining whether a claimant is considered disabled under the law. 20 C.F.R. § 404.1520(a)(4). These steps are evaluated sequentially and require the ALJ to determine whether: (1) the claimant is currently performing any "substantial gainful activity;" (2) the claimant's alleged impairment or combination of impairments is severe; (3) any of the claimant's impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) the claimant is unable to perform her past relevant work based on her RFC; and, (5) the claimant's RFC renders her unable to perform any other work in the national economy. *Id.*; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). The claimant has the burden of proof in Steps 1 through 4. *Fischer v. Barnhart*, 309 F. Supp.2d 1055, 1059 (N.D. Ill. 2004).

The Act also authorizes judicial review of final decisions made by the SSA. 42 U.S.C. § 405(g). A reviewing court only considers whether the ALJ's findings are supported by substantial evidence, not speculation, and were made under the correct legal standard. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In issuing his opinion, the ALJ must state the basis for his analysis so that a reviewing court can follow his reasoning and assess the validity of his decision. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). An ALJ is not required to address all the evidence presented to him, but "the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir.

2001). This requires the ALJ to build an "accurate and logical bridge from the evidence to her conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott*, 297 F.3d at 595. In so doing, a court must be able to follow the ALJ's analysis to ensure that she considered all the evidence critical to the claimant's allegations. *See Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).

A reviewing court will not re-weigh evidence, resolve material conflicts, make independent findings of fact, make credibility decisions, or substitute its own judgment for that of the Commissioner. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Instead, the court determines whether the ALJ's decision is supported by substantial evidence, a standard that requires the ALJ's findings to be based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Although a court accords great deference to an ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott*, 297 F.3d at 595 (internal citation and brackets omitted). If the ALJ's decision is supported by substantial evidence, it should be affirmed. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004).

## IV.

Ms. Muzzarelli raises a number of challenges to the ALJ's decision, although she bases her arguments on what she terms "findings" made by the ALJ instead of alleging error at specific steps of the evaluative process. Some of the findings she identifies relate to more than one part of the ALJ's decision, which is not organized on the basis Ms. Muzzarelli uses in her motion. Restated in the manner that is usual for cases of this type, Ms. Muzzarelli contends that the ALJ erred because

he: (1) incorrectly assessed her credibility; (2) assigned an incorrect weight to Dr. Nemeth's opinion; (3) did not find at Step 2 that she suffered from a severe mental impairment; (4) failed to conclude at Step 3 that her impairments medically equaled a Listing; (5) improperly determined her RFC; and, (6) posed an improper hypothetical question to the VE at Step 5. As most of Ms. Muzzarelli's arguments rely to some degree on her testimony at the hearing, we begin with her claim that the ALJ's credibility determination was erroneous.

A.

Ms. Muzzarelli contends that the ALJ incorrectly assessed her credibility on two grounds. *First*, she claims that no credibility determination was even required in this case because her subjective allegations of pain were both reasonable and predictable in light of her severe impairments. *Second*, the ALJ allegedly failed to state specific reasons for his credibility finding.

Under the standard governing this issue, a court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678. An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements. SSR 96-7p; *see also Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (stating that an ALJ "must articulate specific reasons for discounting a claimant's testimony as being less than credible."). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A reviewing court must be mindful that reversal on this ground is appropriate only if the credibility determination

is so lacking in explanation or support that it is "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Citing SSR 96-7p, Ms. Muzzarelli claims that a credibility assessment was unnecessary because the fact that she has lumbar radiculopathy made her complaints of pain credible on their face. SSR 96-7p sets forth a two-part analysis for evaluating a claimant's symptoms such as pain. As a threshold issue, an ALJ is required to consider whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If a claimant's condition satisfies this part, the ALJ then evaluates the intensity, persistence, and limiting effects of the symptoms that allegedly restrict a claimant's ability to work. Credibility only becomes an issue when an ALJ determines that the medical record does not support a claimant's testimony about her symptoms and their limiting effect. SSR 96-7p. At that point, an ALJ must "obtain available information that could shed light on the credibility of the individual's statements," including the seven factors listed above such as activities of daily living, the treatment history, and aggravating factors. *Id.*

Ms. Muzzarelli argues that the ALJ should have stopped at the first part of this evaluative procedure because he determined that she had impairments that could reasonably be expected to create her symptoms. However, the ALJ would have erred had he followed the approach plaintiff now advocates. Ms. Muzzarelli overlooks that credibility determinations always involve a positive finding as part of SSR 96-7p's first prong and are unnecessary only if the ALJ then concludes at the second prong that the record sufficiently supports the claimant's testimony concerning the functional limitations of the symptoms that are alleged to exist. Here, the ALJ properly moved to the second part of the analysis, in which he found that substantial portions of the medical evidence conflicted

with Ms. Muzzarelli's testimony concerning her limitations, including those that allegedly resulted from her pain. As a result, under SSR 96-7p, the ALJ was required, not prohibited, to assess her credibility in order to fully evaluate the limiting effects of her symptoms. *See* SSR 96-7p (stating that under such facts "the adjudicator must make a finding on the credibility of the individual's statements").

Ms. Muzzarelli's argument that a credibility assessment was unnecessary in light of her diagnosis of lumbar radiculopathy is equally misplaced. She points to the fact that her medications and treatment history support her testimony that her disorder gave rise to pain. The relevant issue, however, is not whether Ms. Muzzarelli experienced pain – which the ALJ never called into doubt – but the reliability of her statements concerning the intensity of that pain and its resulting limitations. A diagnosis of lumbar radiculopathy is not itself sufficient to establish the level of pain and limitation that Ms. Muzzarelli claimed; the fact that a claimant suffers from a given medical condition does not conclusively establish that a claimant's testimony on the limitations stemming from that condition is credible. SSR 96-7p specifically advises ALJs that they "must recognize that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals" with the same diagnosis and medical tests. SSR 96-7p; *see also Schmidt*, 395 F.3d at 745-46 (stating that not all symptoms flow from the same disorder). Under this standard, Ms. Muzzarelli cannot rely on the uncontested fact that she experiences pain or suffers from lumbar radiculopathy. Instead, she must demonstrate why the ALJ failed to properly assess her subjective statements in light of the specific evidence related to her individual condition.

Ms. Muzzarelli makes some move in this direction by claiming in broad terms that the ALJ overlooked her long history of epidural injections and radiofrequency ablations and did not provide specific reasons for his credibility finding. This argument ignores the fact that the ALJ's decision not only discusses the evidence Ms. Muzzarelli points to, but it does so in considerable detail. The ALJ took account of her treatments with Dr. Sharma at length, including the epidural injections and ablations she received to help relieve her pain. Indeed, he based the credibility determination in part on contradictions between this evidence and Ms. Muzzarelli's testimony. She stated at the hearing, for example, that Dr. Sharma's injections were only "minimally" helpful (R. 94-95). However, as the ALJ pointed out, Ms. Muzzarelli reported to Dr. Sharma that she had experienced a forty percent improvement from one injection, a fifty percent improvement from two others, and had "significant pain relief" from the February 5, 2008 ablation (R. 24).[10] Ms. Muzzarelli also told the ALJ that she could only lift eight pounds, but Dr. Sharma himself concluded that she could lift up to twenty pounds (R. 32).

The ALJ also discussed the evidence from Ms. Muzzarelli's treatment with Dr. Kuo and other physicians. Once more, he partially premised his credibility finding on contradictions between their statements about Ms. Muzzarelli and her own testimony. For instance, the ALJ noted that Ms. Muzzarelli told Dr. Savage at the hearing that her back pain became worse when she was weaned off narcotic medications, even though she had earlier reported to Dr. Kuo that her back pain was

---

[10] Dr. Kuo noted on May 1, 2009 that the injections had not provided any significant benefit, and Ms. Muzzarelli may have intended her hearing testimony to mean only that the epidurals provided no long-term relief from her pain. A court "need not defer to a credibility determination based on a misstatement or misunderstanding of the evidence." *Koschnitzke v. Barnhart*, 293 F. Supp.2d 943, 951 (E.D. Wis. 2003) (citation omitted). Ms. Muzzarelli, however, did not explain what she meant by her comment on this point at the hearing and does not raise the issue in her motion. As a result, no basis exists to find that the ALJ misunderstood her testimony or that he was not entitled to find a contradiction in her testimony.

"slightly better" without the medicine (R. 499). As Dr. Kuo reported almost one month after this comment, Ms. Muzzarelli also told him that "she is doing more than she was ever" before and that she had a pain level of five or six out of ten without narcotic pain medication (R. 509).

Inconsistent statements do not always mean that a claimant is not credible. Symptoms can vary over time, and a claimant may provide different versions of his condition to various medical sources. *See* SSR 96-7p (stating that variations in a medical condition "may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms"). Properly considered, however, inconsistencies can form a basis for discounting a claimant's credibility, especially when the claimant's testimony conflicts with the medical record. *See Diaz v. Astrue*, 685 F. Supp.2d 825, 837 (N.D. Ill. 2010). That is the case here, where the inconsistencies noted by the ALJ involve contradictions between the statements Ms. Muzzarelli made at specific points in her treatment history and the testimony she gave about those same treatments. As the ME himself stated, correlating the two is "a bit confounding" under these facts (R. 107).

In a series of challenges to the credibility determination, Ms. Muzzarelli also argues that the ALJ failed by not crediting her testimony that she experienced adverse side effects from her pain medication such as nausea and fatigue.[11] The ALJ concluded that the evidence did not support the side effects Ms. Muzzarelli complained of at the hearing, and she points to no part of the record that contradicts this finding. She also does not take issue with the fact that the ALJ relied on Dr.

---

[11] Although Ms. Muzzarelli had stopped taking narcotic pain medications by May 22, 2009, several of the drugs she was taking at the time of the hearing can cause one or both of these symptoms. Lyrica, Ultracet, and Cymbalta have somnolence as a possible side effect; Ultracet, Cymbalta, and Mobic can cause nausea. *See* Physicians' Desk Reference 1760, 2678, 2802 (65th ed. 2011); *see also* http://www.drugs.com/sfx/mobic-side-effects.

Sharma's treatment notes indicating that she did not experience any side effects from her medication (R. 32, 464, 477, 481, 484). The ALJ was entitled to cite the lack of medical evidence on this point because SSR 96-7p states that an ALJ "must consider" its absence as part of a credibility determination. SSR 96-7p.

Ms. Muzzarelli also contends that Dr. Templin's May 11, 2009 treatment note provides evidence of disabling pain that went unrecognized by the ALJ. The ALJ noted, however, that Dr. Templin reported on May 11 that Ms. Muzzarelli was experiencing a pain level of five out of ten, well below the level of nine that she reported at the end of the hearing (R. 27-28, 118, 493). Thus, his treatment note supports, rather than refutes, the ALJ's conclusion that Ms. Muzzarelli's statements to her physicians did not accord with the disabling pain she alleged at the hearing.

We recognize that an ALJ may not discredit a claimant's testimony merely because the record does not substantiate her subjective statements. *See* SSR 96-7p ("[A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded because they are not substantiated by objective medical evidence.") (emphasis omitted). Especially when pain is involved, subjective testimony can be sufficient to establish disability, even when the objective evidence does not fully support allegations of pain. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). As *Carradine* makes clear, however, such testimony only suffices when it is "supported by medical evidence that satisfies the pain standard." *Id.* (internal quote and citation omitted); *see also* 20 C.F.R. § 404.1529(a) ("However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings . . . .").

In this case, the record does more than fail to substantiate Ms. Muzzarelli's subjective complaints of pain. The evidence cited in the ALJ's decision is at odds with her statements to such

a degree that we cannot say that the ALJ erred in finding that it failed to substantiate her claims at the hearing of severe pain. Ms. Muzzarelli claims that the ALJ did not consider all the evidence that could have supported her allegations, an omission that would constitute an impermissibly selective view of the record. *See Diaz*, 55 F.3d at 307. But she does not state what evidence the ALJ should have discussed other than the epidural treatments and the diagnoses, which the ALJ in fact addressed. The ALJ's detailed account of Ms. Muzzarelli's treatment history accurately cites numerous portions of the record supporting her claim that she suffered from significant back pain that was not resolved by treatment. The ALJ noted, for example, her disappointing results with aqua therapy, the levels of pain she claimed at her treatment sessions, her pain medications, variations she experienced in her condition, and new symptoms such as numbness in her arms (R. 22-32). Together with her activities of daily living, non-medication treatments, other measures used to alleviate pain, and statements from her family members – items that the ALJ addressed at some length – this evidence covers all seven of the credibility factors set forth in the SSR 96-7p. Ms. Muzzarelli does not argue that the ALJ's discussion of any of these specific factors was erroneous, but instead quarrels with his bottom line credibility assessment. On this record, we cannot conclude that the ALJ's extensively explained credibility determination is patently incorrect, or that substantial evidence does not support it.

### B.

Ms. Muzzarelli also claims that the ALJ erred in his assessment of the opinion of her treating physician, Dr. Nemeth. A treating physician's opinion is entitled to controlling weight when it is supported by the objective medical record and is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(d)(2); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Even when an

ALJ finds that a treating physician's report is not entitled to controlling weight, the ALJ may not simply reject the report or opinion out of hand. SSR 96-2p. Instead, he must determine the weight that should be assigned to the report by discussing the length, nature, and extent of the treating relationship, the supporting evidence in the record, the consistency of the opinion with the record, and the physician's medical speciality. 20 C.F.R. § 404.1527(d). Social Security Ruling 96-2p provides that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Whatever his decision, the ALJ must provide "good reasons" to support it. 20 C.F.R. § 404.1527(d)(2).

Dr. Nemeth submitted two types of records, a "To Whom It May Concern Letter" dated July 16, 2009 and five treatment notes from April through July of 2009.[12] The letter states that Ms. Muzzarelli "is presently disabled and unable to work at this particular time because of severe pain, stiffness and inability to flex her spine. She needs a . . . laminectomy and fusion on her back[,] . . . but she is too young to have the procedure" (R. 506). Dr. Nemeth also wrote that several other spine surgeons had concluded that she "is totally disabled" (*id.*). Ms. Muzzarelli's claim that the ALJ should have accepted this statement overlooks that treating sources like Dr. Nemeth are only permitted to provide medical opinions on the nature and severity of a claimant's impairments. 20 C.F.R. § 404.1527(e)(2). Statements that a claimant is disabled are nonmedical in nature and involve

---

[12] We note that it is not entirely clear what specific weight the ALJ assigned to the records provided by Dr. Nemeth. The ALJ concluded that the "To Whom It May Concern" letter was given no weight (R. 29). The ALJ then proceeded to discuss the contents of both that letter and Dr. Nemeth's treatment notes, following which the ALJ stated that "his opinion is entitled to less weight" (*id.*). The second weighting does not distinguish between the letter and the treatment notes, and thus creates unnecessary ambiguity. However, that ambiguity between whether certain evidence was given no weight or less weight is immaterial, since Ms. Muzzarelli agrees that the opinions were entitled not just to some weight, but to controlling weight.

issues reserved to the Commissioner. *See Wates v. Barnhart*, 274 F. Supp.2d 1024, 1036 (E.D.Wis. 2003). For this reason, the ALJ was not required to give controlling weight to Dr. Nemeth's statement on this issue because the regulations state that an ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner[.]" 20 C.F.R. § 404.1527(e)(3). *See also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled").

Ms. Muzzarelli finds herself on firmer ground by noting that the ALJ did not fully account for the length of her relationship with Dr. Nemeth. An ALJ should consider the length and nature of the treatment relationship when assigning weight to a medical source. 20 C.F.R. § 404.1527(d)(2)(ii). Ms. Muzzarelli points out that she testified at the hearing that she had been seeing Dr. Nemeth two to three times a year prior to the onset of her back problem but had recently increased her visits to once a month (R. 77). The ALJ wrote that Ms. Muzzarelli had only been seeing Dr. Nemeth since April 2009, the date of the earliest treatment note in the record (R. 29). He provided no explanation of why he rejected her testimony that the relationship with her physician was significantly longer than the record suggested.

Any oversight by the ALJ on this issue was not determinative, however, because he provided other reasons that support his decision not to give controlling weight to Dr. Nemeth's opinion. In particular, the ALJ laid considerable stress on the fact that Dr. Nemeth's opinion is at odds with other evidence in the record. Contrary to Dr. Nemeth's statement that Ms. Muzzarelli needed to have spinal fusion surgery, Dr. Kuo concluded on May 1, 2009 that she should not have such an operation (R. 513). Dr. Templin also stated on May 11 that "she is a poor candidate for surgical intervention

in the form of fusion" (R. 494). Neither physician premised his finding on the fact that Ms. Muzzarelli was too young for such an operation or concluded that she was "disabled," as Dr. Nemeth stated. Dr. Nemeth's July 16, 2009 treatment note states that Ms. Muzzarelli could barely walk, but the ALJ noted that Dr. Kuo had remarked on May 1, 2009 that she was able to walk two miles a day (R. 29, 513).

Ms. Muzzarelli takes notice of the ALJ's findings on this issue, and responds that Dr. Kuo treated her primarily for problems with her wrists and arms, not her spine. This claim fails to acknowledge that Dr. Kuo's treatment notes refer to Ms. Muzzarelli's spine problems at length. She also states that Dr. Nemeth was more familiar with the opinion of her neurosurgeon, Dr. DePhillips. But that physician recommended that Ms. Muzzarelli have the less invasive biacuplasty or IDET procedure before considering the spinal fusion that Dr. Nemeth stated she required (R. 455). Like Drs. Kuo and Templin, Dr. DePhillips made no comment on her ability to work, capacity to walk, or an age restriction that would prevent spinal fusion surgery (R. 455).

An ALJ is entitled to deny controlling weight to a treating physician's opinion when it is not supported by the record or is inconsistent with other evidence. *See Clifford*, 227 F.3d at 870. Accordingly, Ms. Muzzarelli has not shown why substantial evidence does not support the ALJ's decision not to give Dr. Nemeth's opinion controlling weight.[13]

### C.

At Step 2, the ALJ found that Ms. Muzzarelli's degenerative disc disease, lumbar radiculopathy, and carpal tunnel syndrome constituted severe impairments (R. 16). Ms. Muzzarelli

---

[13] Ms. Muzzarelli also argues that the ALJ erred by allegedly giving no weight to Dr. Savage's statements at the hearing. In reality, the ALJ gave great weight to the ME's RFC testimony (R. 30).

takes issue with this finding by claiming that the ALJ failed to conclude that other disorders she suffered from were severe, including a mental impairment, myofascial-related pain syndrome, tennis elbow, lumbar degenerative facet changes, right paracentral disc protrusion, and her fifty percent loss of disc height. SSR 96-3p establishes the guidelines for evaluating whether an impairment should be found to be severe: "An impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p. If a severe impairment is found, the analysis proceeds to Step 3 to consider if an impairment or combination of impairments meets or medically equals a listed impairment; if no condition qualifies as severe at step two, a claimant is found to be not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii) ("If you do not have a severe . . . impairment . . . we will find that you are not disabled").

Ordinarily, we would address Ms. Muzzarelli's Step 2 challenge without a detailed discussion. A determination at Step 2 that a medical condition is severe "is merely a threshold requirement" that obligates an ALJ to continue to Step 3. *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999); *see also Raines v. Astrue*, No. 06-cv-0472, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007) ("As long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to label an impairment as 'severe'"). In this case, however, two factors favor a more thorough consideration of the Step 2 issues. *First*, Ms. Muzzarelli's objections to the ALJ's decision do not clearly differentiate between Step 2 and later steps, thereby making it difficult to separate all of her arguments on a step-by-step basis. *Second*, her later RFC arguments concerning her alleged mental impairment depend to some degree on the ALJ's Step 2 assessment of whether that impairment was severe.

30

That said, not all of Ms. Muzzarelli's Step 2 claims warrant a full analysis. We omit a discussion of her tennis elbow, which she does not include as part of her subsequent arguments. We also note that, aside from the mental impairment issue, Ms. Muzzarelli has provided no specific argument on any of her claims related to Step 2. Perhaps for this reason, the Commissioner has not addressed the Step 2 issues. The Seventh Circuit has repeatedly stated that courts are not obligated to reconstruct arguments or provide research for litigants. *See, e.g., United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006); *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003). With respect to Ms. Muzzarelli's undeveloped allegations concerning her facet changes, disc protrusion, and loss of disc height, we note that Dr. Savage testified that the problems Ms. Muzzarelli points to were part of her "degenerative joint disease" (R. 100). Thus, we consider these conditions Ms. Muzzarelli describes to be embraced with the degenerative disc disease the ALJ found to be a severe impairment at Step 2. Ms. Muzzarelli has not cited any part of the record suggesting that they are independent impairments that should be seen as distinct from the disorders the ALJ cited at Step 2, or that they impose limitations that were not accounted for as part of her other spine disorders at Step 2.

Ms. Muzzarelli's claim concerning myofascial pain is also undeveloped, but merits a brief comment. Dr. Savage testified at the hearing that Ms. Muzzarelli suffered from a myofascial-related pain syndrome related to her psychological condition, and he interpreted the record as indicating that Dr. Templin had referred her to a psychiatrist for this problem (R. 101). As the ALJ noted, Dr. Templin actually referred Ms. Muzzarelli to a physiatrist, not a psychiatrist. Read in the context in which his comment occurs, Dr. Templin did not so much diagnose her with such a disorder as he referred her to a physiatrist for that very purpose; he stated that a physiatrist "may help with

myofascial-related pain syndrome *as she has not been evaluated for this*" (R. 494) (emphasis added). The record does not indicate that Ms. Muzzarelli followed up on Dr. Templin's recommendation or that she ever received a diagnosis of myofascial-related pain syndrome. Even if she did, Ms. Muzzarelli has not stated what restrictions that alleged condition imposed on her that would require a finding of "severe" at Step 2. Dr. Templin gave no indication that it imposed any limitations, and she did not identify any problem related to myofascial pain at the hearing. *See* 20 C.F.R. § 404.1521(a) (stating that an impairment that "does not significantly limit your physical or mental ability to do basic work activities" is non-severe). As a result, Ms. Muzzarelli has not demonstrated that she suffered from myofascial-related pain syndrome or, if she did, that the ALJ should have found it to be a severe impairment at Step 2.

Ms. Muzzarelli's claim concerning an alleged mental impairment presents significantly different issues. When considering whether a mental impairment exists, the SSA applies a "special technique" at each level of the administrative process. 20 C.F.R. § 404.1520a(a). An ALJ does so by first determining that an impairment actually exists based on a claimant's signs and symptoms. 20 C.F.R. § 404.1520a(b)(1). He then evaluates its severity by reference to the "Paragraph B criteria" set forth in Listing 12.00C. 20 C.F.R. § 404.1520a(c)(2). These criteria include four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. Pt. 404, Supbt. P, App. 1 § 12.00C. The first three of these components must be rated by the ALJ on a five-point scale as none, mild, moderate, marked, or extreme. The fourth area is rated on a four-point scale as none, one or two, three, or four and more. 20 C.F.R. § 404.1520a(c)(4). If an ALJ finds that a claimant's limitations in the first three functional areas should be rated as "none" or "mild," together with a finding of

"none" in the fourth area, he is entitled to conclude that a mental impairment is not severe unless other evidence suggests a limitation that is more than mild. 20 C.F.R. § 404.1520a(d)(1). An ALJ must specifically indicate the findings for each functional area and incorporate all of a claimant's significant medical history. *Craft*, 539 F.3d at 675.

The ALJ omitted a full discussion of the special technique's first prong, but stated at the end of his analysis of the Paragraph B criteria that Ms. Muzzarelli suffered from a "medically determinable mental impairment" (R. 18). He further found that under the Paragraph B factors she had only mild limitations in the functional areas of activities of daily living, social functioning, and concentration, with no episodes of decompensation (R. 16-17).[14] Ms. Muzzarelli challenges the ALJ's conclusion concerning her concentration by arguing that he failed to consider her functioning in a work setting. She contends that an assessment of her functional ability in a work environment was required based on the following language from the Listings:

> In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g. filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or objective.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C(3). Ms. Muzzarelli also argues that her own testimony was enough to show that she had more than a mild limitation in her ability to concentrate.

---

[14] The ALJ did not attribute all these limitations to Ms. Muzzarelli's mental impairment. He found that her mild limitation in activities of daily living was the result of pain instead of a mental impairment (R. 17). The ALJ also discussed Ms. Muzzarelli's limitations in concentration and social functioning as the result of pain, but he did not find that these limitations stemmed only from pain. Presumably, the ALJ concluded that these mild restrictions were the result of Ms. Muzzarelli's mental impairment.

The first of these arguments fails to account for the full scope of the language provided in the Listings. Listing 12.00C(3) states that deficits in concentration, persistence, or pace "are best observed in work settings[.]" *Id.* It does not, however, make a work setting analysis mandatory, and explicitly recognizes that difficulties in concentration "may also be reflected by limitations in other settings" as well as in work environments. The ALJ considered Ms. Muzzarelli's ability to concentrate based on her testimony concerning activities in the home environment, and he compared her statements on these issues to the medical record before him. The ALJ's discussion of this issue relied primarily on Ms. Muzzarelli's own testimony and on evidence in the medical record. The Paragraph B criteria for assessing the severity of a mental impairment specifically allow an ALJ to rely on these two sources of information, as well as other evidence that may be available from mental health care providers. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(B).[15] Ms. Muzzarelli does not address how or why this was insufficient to meet the language in Listing 12.00C(3) allowing an ALJ to evaluate her concentration in settings outside the workplace. Rather, she appears to claim that Listing 12.00C(3) requires a workplace setting as a *per se* rule, but has not provided any authority stating that an ALJ errs merely by choosing a non-workplace environment as the basis for measuring the severity of a claimant's ability to concentrate.

Ms. Muzzarelli's second argument on this issue relies on the statements she made at the hearing about her difficulty in concentrating for long periods. However, since we have found that the ALJ's credibility assessment was not patently wrong, we cannot conclude that the ALJ erred by

---

[15] Ms. Muzzarelli points out that clinical evaluations are often performed to assess a claimant's limitations in this functional area, but she does not claim that the ALJ erred in not ordering one for her. Listing 12.00C(3) only states that major limitations "can often be assessed through clinical examination or psychological testing." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C(3). Ms. Muzzarelli does not explain why clinical testing was required here.

construing her subjective statements as indicating anything more than a mild limitation in the ability to concentrate. Moreover, Listing 12.00D states that "[t]here *must* be evidence from an acceptable medical source showing that you have a medically determinable mental impairment." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00D(1)(a) (emphasis added). This requirement applies both to the determination of the impairment and to the assessment of its degree of limitation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00D. Ms. Muzzarelli does not point to any part of the medical record in this case to support a claim that she had more than a mild limitation in the area of concentration, persistence, or pace. Accordingly, she has not shown why the ALJ's finding on this issue is not supported by substantial evidence.

### D.

At Step 3, Ms. Muzzarelli argues that the ALJ erred by not finding that her impairments medically equal a listed impairment. The Listings describe conditions considered presumptively disabling when a claimant's medical impairments meet all the criteria set forth in a specific Listing. 20 C.F.R. §§ 404.1525(a) & 416.925(a); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). If a claimant does not meet a Listing, she may still medically equal it if the criteria of one of three different tests are met. 20 C.F.R. § 404.1526(b)(1)-(3). Under the third of these possibilities, when a claimant has a combination of impairments, but no single impairment meets a Listing, an ALJ:

> will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. § 404.1526(b)(3). In order to meet or equal a listed impairment, the claimant bears the burden of proving that her condition satisfies all of the criteria of the specific Listing requirement. *Maggard*, 167 F.3d at 379.

The ALJ found that "considered singly and in combination," Ms. Muzzarelli's impairments did not meet or equal Listing 1.04, which involves spine disorders (R. 18). Ms. Muzzarelli takes issue with this conclusion in a series of related claims concerning the adequacy of the ALJ's stated reasons for his decision. Citing *Vujnovich v. Astrue*, No. 2:10-CV-43, 2011 WL 1157499 (N.D. Ind. March 28, 2011), she contends that the ALJ was not entitled to rely on Dr. Savage's testimony that she did not meet the equivalence standard because Dr. Savage failed to discuss the issue in any detail. *Vujnovich*, however, is readily distinguished from the facts of this case. An ALJ must receive expert testimony on medical equivalence before deciding the issue at Step 3 because equivalence is a medical, not a legal, issue. *See* SSR 96-6p; 20 C.F.R. § 404.1526(c). *See also Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."). In *Vujnovich*, the ALJ stated that he had done so as part of his Step 3 equivalence finding, but the ME in that case had not, in fact, given an opinion on medical equivalence at the hearing. As a result, the ALJ was not entitled to rely on the expert's statements to find that the claimant's impairments did not equal a Listing. *Vujnovich*, 2011 WL 1157499, at *7.

By contrast, the ALJ in this case directly asked the ME if Ms. Muzzarelli's impairments either met or medically equaled Listing 1.04. Dr. Savage stated that they did not (R. 102). Contrary to Ms. Muzzarelli's claim, *Vujnovich* does not address the level of detail that must be involved in a medical expert's testimony; it only applies the well-established standard that an expert must provide an

opinion that supports the ALJ's decision. In fact, no hearing testimony is required on the issue at all because an ALJ can even rely on the form reports provided by state agency physicians at the initial and reconsideration levels of review. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

Perhaps recognizing this fact, Ms. Muzzarelli changes her focus to argue that the ALJ did not sufficiently discuss his reasons for finding that her impairments do not equal a Listing. An ALJ must always "minimally articulate his or her justification for rejecting or accepting specific evidence of disability." *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988); *see also Barnett*, 381 F.3d at 668. It is true that the ALJ in this case did not discuss the "meets" and "medically equals" issues as separate from one another. He chose instead to address the two together by relying on the medical record and Dr. Savage's testimony (R. 19). Far from doing so in the abbreviated form Ms. Muzzarelli claims, however, the ALJ discussed his reasons in some detail. He first stated:

> Nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listings of Impairments. Dr. Savage, the medical expert present at the hearing, testified that based on his review of the record the claimant's degenerative disc disease and lumbar radiculopathy are not of listing-level severity because the claimant has normal motor functioning with full strength, normal sensory function, normal deep tendon reflexes, no weakness, and no consistent documentation of supine/standing positive straight leg raise. He concluded that the claimant's disorder was primarily pain related and did not involve motor function.

(R. 19). Three additional paragraphs address why the evidence in this case did not meet the criteria for evaluating impairments involving a nerve root compression, spinal arachnoiditis, and lumbar spinal stenosis that are set forth in Listing 1.04(A)-(C) (R. 19). The ALJ's discussion not only minimally articulates his reasons for finding that Ms. Muzzarelli's impairments did not meet or equal a Listing, it far exceeds the threshold requirement by providing a detailed survey of the evidence related to Listing 1.04. *Cf. Steward*, 858 F.2d at 1299 (stating that an ALJ is not required to

articulate his reasons for accepting a consulting expert's statement on medical equivalence when, as in this case, the treating physician gave no opinion on the issue).

Ms. Muzzarelli does not dispute the ALJ's account of Dr. Savage's testimony, nor does she point to some other Listing that should have been considered at Step 3. Instead, she claims without further explanation that the ALJ erred by failing to discuss as part of his equivalence finding an alleged impairment that extended from her cervical spine to her lumbar spine. Presumably, Ms. Muzzarelli's description includes her entire back from the neck to the sacral spine. Ms. Muzzarelli points to no evidence concerning her cervical, thoracic, or lumbar spine that the ALJ should have considered but failed to do so. She also provides no discussion of why the ALJ would have reached a different decision if he had discussed the evidence she claims is missing in his decision. *See Alesia v. Astrue*, 789 F. Supp.2d 921, 932 (N.D. Ill. 2011) ("An ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing") (citing *Scheck*, 357 F.3d at 700-01).

The ALJ based his Step 3 decision on the ME's testimony concerning Ms. Muzzarelli's degenerative disc disease and lumbar radiculopathy (R. 19). Dr. Savage reached his conclusion after reviewing the record concerning her cervical and lumbar spine, which the ALJ set forth in other parts of his decision in great detail (R. 23-26). Moreover, the initial radiology report that evaluated her back problem stated that her thoracic spine was normal (R. 318). Ms. Muzzarelli bears the burden of proving that her condition meets or equals a Listing, *Maggard*, 167 F.3d at 381, and she has not

shown why the ALJ erred in his Step 3 finding in the absence of evidence supporting her contention.[16]

### E.

At Step 4 and Step 5, an ALJ must consider a claimant's ability to perform work-related duties. He does so by first assessing a claimant's RFC based on all relevant evidence in the record. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The ALJ in this case found, in relevant part, that Ms. Muzzarelli could perform a reduced range of light work, including the ability to lift ten pounds occasionally, to sit for four hours, and to stand for six hours. A sit/stand option was allowed so that she could alternate between these two positions at will for five minutes out of each hour. Despite her allegations of carpal tunnel syndrome, the ALJ determined that Ms. Muzzarelli could carry out fine and gross manipulation on a frequent basis (R. 19). He did not explicitly include any of the functional limitations allegedly caused by her mental impairment as part of the RFC.

Ms. Muzzarelli takes issue with the ALJ's RFC assessment on three grounds. She argues that the ALJ: (1) failed to include a non-exertional limitation to account for her difficulty in concentration; (2) erred in stating her exertional level; and, (3) did not adequately explain how she could carry out her job tasks for an entire eight-hour day. The Commissioner has not responded to

---

[16] Ms. Muzzarelli's unusual method of asserting her claims makes it unclear if she includes her difficulties in concentration as part of the Step 3 issue. The Commissioner interprets her brief in this manner, but any claim she may have asserted on this issue fails. At Step 3, an ALJ must consider the aggregate effects of all a claimant's impairments, including those that are non-severe. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Alesia*, 789 F. Supp.2d at 932-33. Ms. Muzzarelli does not contend, however, that her concentration problems have any relevance to Listing 1.04, which concerns her spine. Given that she does not argue that the ALJ should have considered any Listing other than 1.04, she presents no developed argument on this issue. *See Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) (stating that "skeletal, undeveloped, perfunctory or unsupported arguments are deemed waived.").

the first and third of these arguments. *See Palmer v. Marion County,* 327 F.3d 588, 597-99 (7th Cir. 2003) (stating that claims not addressed in response to a summary judgment motion are deemed abandoned). However, as Ms. Muzzarelli's arguments on these issues are less than clear, we find that the Commissioner's oversight of them does not constitute a wavier.

### 1.

Ms. Muzzarelli first contends that the ALJ should have included her concentration-related limitations in the RFC because Dr. Savage opined that "there are definite functional limitations due to the pain" she experienced (R. 107). This argument overlooks that the context of the ME's statement shows that he meant limitations on her physical ability to perform work, not restrictions that resulted from problems in concentration. For example, Dr. Savage testified that Ms. Muzzarelli's pain would limit her ability to lift objects and would restrict her ability to bend, stoop, and climb (R. 107). He gave no opinion on the limitations that might result from the statements she made at the hearing concerning concentration.

Ms. Muzzarelli also claims that her testimony was sufficient to require a RFC limitation that accounted for her concentration problem. This argument assumes that Ms. Muzzarelli's testimony was fully credible, but we have already found that substantial evidence supports the ALJ's conclusion that it was entitled to less than complete credibility. In particular, the ALJ found that Ms. Muzzarelli's doctors "consistently found her to be alert and well oriented in mental status reports throughout the medical evidence of record" (R. 32). Ms. Muzzarelli has not cited any medical evidence that contradicts this finding. Notwithstanding, Ms. Muzzarelli's reliance on her statements at the hearing cannot be set aside entirely because the ALJ did not reject all of her testimony on this issue. The ALJ relied on her statements to find at Step 2 that she has a non-severe mental

impairment, with a mild limitation in her ability to concentrate. In light of this finding, we rephrase Ms. Muzzarelli's argument to be that the ALJ erred by not including her mild Step 2 mental limitations in the RFC.[17] *See* SSR 96-8p.

That said, we cannot fully address Ms. Muzzarelli's argument because the ALJ failed to clarify whether the functional limitations that were found to exist at Step 2 were included in the RFC. On the one hand, neither the RFC nor the discussion that supports it cites Ms. Muzzarelli's mild limitations in these areas. On the other hand, the ALJ concluded his analysis of the special technique at Step 2 by stating: "Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental functional analysis" (R. 18).[18] It is unclear what the ALJ meant by saying that the RFC "reflects" his Step 2 findings concerning Ms. Muzzarelli's mental limitations. He could have intended this to mean that the RFC was designed to incorporate the mild impairments identified at Step 2, even though they were not specifically mentioned in the RFC.[19] He could also have meant that he considered the Step

---

[17] The ALJ found that Ms. Muzzarelli's mild limitation in activities of daily living was the result of pain instead of a mental impairment. However, we consider all three of the mild functional limitations found at Step 2 – activities of daily living, social functioning, and concentration – as limitations relevant to the RFC analysis. The ALJ assessed the severity of all three by using the special technique, and he referred to all of them in the language discussed below.

[18] As the ALJ recognized, the special technique used at Step 2 can be related to a mental RFC assessment under certain conditions. SSR 96-8p explains that the "functions" described in the Paragraph B and Paragraph C criteria of Listing 12.00 (mental disorders), which form the basis of the special technique, can establish a RFC when an ALJ provides a "detailed assessment" of those functions. SSR 96-8p. The ALJ clearly believed that his analysis at Step 2, which discussed Ms. Muzzarelli's ability to concentrate in considerable detail, was sufficient to satisfy this requirement.

[19] The sit/stand option could have been based, at least in part, on the concentration limitation. That option was designed to allow Ms. Muzzarelli to change positions each hour in order to relieve the pain she experiences after sitting for long periods. Pain also formed the basis for the ALJ's analysis of Ms. Muzzarelli's concentration problem (R. 17-18). Thus, the sit/stand option could have been designed to accommodate her limitations in both sitting and concentration, as both were based on pain.

2 limitations as part of the RFC analysis but found them to be too mild to warrant additional non-exertional restrictions.

Courts have remanded cases where an ALJ relied on language identical to that used at the end of Step 2 in this case because it fails to clarify the degree to which the RFC expresses the functional limitations found under the special technique. *Bond v. Astrue*, No. CIV-10-452, 2011 WL 2532967, at \*5-6 (W.D. Okla. May 26, 2011). We find that this reasoning also requires remand under these facts because the ALJ failed to explain how his Step 2 discussion of Ms. Muzzarelli's restrictions in activities of daily living, social functioning, and concentration are "reflected" in the RFC itself. If the ALJ believed that the mild limitations in these functional areas did not merit a non-exertional limitation in the RFC, he was obligated to explain that conclusion so that we can follow the basis of his reasoning. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). On remand, the ALJ shall clarify his meaning so that a reviewing court can assess his finding in light of the evidence.

Moreover, even if the RFC is read to include Ms. Muzzarelli's mild Step 2 limitations, remand is still required because the ALJ failed to consider the aggregate impact of all of her severe and non-severe impairments. The RFC must consider the combined effect of all the impairments a claimant has, "even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). SSR 96-8p explains that a non-severe impairment may not significantly limit a claimant's ability to work when viewed in isolation, but it can "be critical to the outcome of a claim" when seen together with other limitations. SSR 96-8p. The failure to consider the full impact of a claimant's severe and non-severe impairments requires reversal. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). *See also Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000) (stating that an ALJ must "consider the *aggregate* effect of [a claimant's] ailments").

42

The ALJ gave no indication at either Step 2 or in the RFC analysis that he considered what impact Ms. Muzzarelli's mild functional limitations might have when considered in tandem with her severe physical impairments. The ALJ may have believed that Ms. Muzzarelli's mental limitations were too mild to add to the restrictions that stemmed from her severe impairments. If so, he was required to state that fact and to make the basis of his reasoning clear. *See Zurawski*, 245 F.3d at 889 ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits"). He may also have overlooked the issue altogether. In either case, the language used by the ALJ at the end of Step 2 fails to give any indication that he considered the aggregate impact of all of Ms. Muzzarelli's impairments. *See Alesia*, 789 F. Supp.2d at 933 (rejecting identical language at the end of Step 2 as insufficient "because the combined impact of the impairments must be considered throughout the disability determination process") (internal quote and citation omitted). Once more, the ALJ shall explain on remand the aggregate impact that Ms. Muzzarelli's limitations in activities of daily living, social functioning, and concentration have when considered together with her severe physical limitations.

## 2.

The ALJ found that Ms. Muzzarelli could perform a reduced range of light work, had the ability to lift ten pounds occasionally, and could sit for four hours and stand for six hours (R. 19). The last two requirements were based on a sit/stand option allowing her to change positions every hour. A claimant falls within an exertional level if he can perform "at least substantially all of the activities" that are required for a given level, but is not able to perform the duties at a higher exertional category. SSR 83-10. A full range of light work is defined as the ability to lift ten pounds frequently and to lift up to twenty pounds on occasion. 20 C.F.R. § 404.1567(b). An individual

must also be able to stand and walk for six hours a day, with intermittent sitting in the remaining time. SSR 83-10. When a claimant is found not to be able to carry out all the requirements of a given level, he falls between exertional categories. *See Frobes v. Barnhart*, 467 F. Supp.2d 808, 821 (N.D. Ill. 2006).

Ms. Muzzarelli argues that the ALJ incorrectly combined the standards for sedentary work with those for the reduced light work specifically mentioned in the RFC. She claims that this was erroneous because the ALJ found that she could only sit for four hours a day, and sedentary work requires a person to sit for up to six hours in a work day. *See* SSR 83-10 (describing the requirements for the various exertional levels). We agree that the ALJ's RFC is unclear as it currently stands. The ALJ defined what he meant by "reduced light work" by referring to 20 C.F.R. § 404.1567(a). However, that regulation explains the duties of sedentary work, not light work. The regulation governing light work does provide that a claimant who is able to perform at that level is also considered to be able to carry out sedentary work. *Id.* But the regulation restricts the scope of this provision by excluding claimants who have "additional limiting factors such as . . . [the] inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). That is what the ALJ found by limiting Ms. Muzzarelli to only four hours of sitting.[20]

In response, the Commissioner contends that the ALJ simply made a mistake in articulating the RFC and that substantial evidence shows that Ms. Muzzarelli could work at the sedentary level.

---

[20] Ms. Muzzarelli also argues that a sedentary RFC was erroneous because she cannot carry out "frequent fine and gross manipulation with both hands," as the ALJ concluded (R. 19). We disagree. Sedentary work requires "good use of the hands and fingers for repetitive hand-finger actions." SSR 83-10. However, Dr. Savage stated at the hearing that Ms. Muzzarelli had the ability to carry out the kind of frequent gross and fine manipulation that the ALJ included in the RFC, and she does not object to this testimony (R. 111). While the final responsibility for determining Ms. Muzzarelli's RFC rested with the ALJ, he was entitled to rely on the medical expert's undisputed testimony to assess her ability to handle and manipulate objects. *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002).

In a somewhat convoluted argument, the Commissioner claims that Dr. Savage testified that Ms. Muzzarelli could sit for up to six hours each day – a finding that would support a sedentary exertional level. The Commissioner correctly notes that the ALJ indicated in his decision that he was adopting Dr. Savage's RFC assessment (R. 30). According to the Commissioner, this intent shows that the ALJ actually meant to state that Ms. Muzzarelli could sit for "six" hours, as the ME had allegedly testified, and he included the "four" hour restriction only by mistake.

We turn directly to what Dr. Savage stated at the hearing in order to assess this argument. The ME's comments were brief, but they were not entirely clear. Dr. Savage initially evaluated Ms. Muzzarelli's ability to sit and stand by testifying:

> I think she would need the opportunity for change of position, sit/stand option every one to two hours. And I think the – otherwise, she could sit/stand for – on good days six hours out of eight. On bad days four hours out of eight.

(R.107). The ALJ appears to have been unsure of what the ME was actually stating and quickly sought clarification of his comments as follows:

> Q: [Y]ou said that she could stand on a good day for six hours and on a bad day for four hours.
>
> A: Yes.
>
> Q: What about sitting on a good versus a bad day?
>
> A: I think there would be the need for frequent positional changes, sit/stand options, as often as one every hour. But I think that she could sit for six out of eight hours in that circumstance.

(R. 108). As this testimony shows, the ALJ asked Dr. Savage how Ms. Muzzarelli's capacity to sit and stand would vary, depending on whether she was having a good day or a bad day. The ME's response concerning the standing issue was clear: Ms. Muzzarelli could either stand for six hours

on a good day, or for four hours on a bad day. Notably, Dr. Savage's testimony assumed that Ms. Muzzarelli would *generally* alternate between "good" and "bad" days, and that her ability to stand would vary accordingly.[21] The ALJ adopted this assumption and asked the ME to clarify how Ms. Muzzarelli's ability to sit would vary based on this fluctuation between good and bad days. However, Dr. Savage did not respond to the specific terms of ALJ's last question. Instead, he overlooked the "good versus a bad day" premise of the ALJ's question and testified only that Ms. Muzzarelli could sit for up to six hours if she had a sit/stand option.

The Commissioner interprets Dr. Savage's testimony to mean that Ms. Muzzarelli would be able to sit for six hours *each* work day, irrespective of whether she were having a "good" or a "bad" day. It is not clear that the ME intended that to be his meaning. His last statement to the ALJ did indicate that Ms. Muzzarelli could sit for up to six hours with a sit/stand option, but Dr. Savage failed to clarify whether this would be the case on a good day, on a bad day, or on all days. This lack of clarity created an ambiguity in the ME's testimony concerning the sitting issue, the resolution of which rested with the ALJ. *See* SSR 96-8p (stating that an ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved").

Instead of resolving that ambiguity, the ALJ compounded the problem by reaching three different conclusions about what the ME's testimony actually meant. *First*, shortly after Dr. Savage's testimony, the ALJ proposed a series of hypothetical questions to the VE. The second of these, and the only one to address the ME's testimony, asked the VE to consider what work Ms. Muzzarelli could perform under the limitations that Dr. Savage had allegedly stated would be present on her

---

[21] We note that Dr. Savage's other RFC testimony was also premised on variations between good and bad days. For example, he stated that her exertional level fell between the sedentary and light categories on this basis. "On bad days it would be more like sedentary and on good days closer to a light" (R. 107).

"worst days" (R. 114). As the ALJ stated, this meant "[n]ot her good days, but her bad days" (*id*.). The ALJ described these restrictions to the VE as involving the ability to sit for six hours and to stand for four hours. This is the RFC relied on by the Commissioner to claim that Ms. Muzzarelli can perform sedentary work.

*Second*, the ALJ then described his own understanding of Dr. Savage's RFC testimony in the narrative discussion that supports the RFC assessment contained in the ALJ's decision. The ALJ stated that the ME concluded that Ms. Muzzarelli could sit and stand for six hours on a good day, but could sit and stand only for four hours on a bad day (R. 30). This description contradicts the ALJ's version of Dr. Savage's "worst day" limitations that were proposed to the VE; Ms. Muzzarelli's ability to sit on a bad day is now said to be four hours instead of six hours.

*Third*, the actual RFC set aside this narrative account of the ME's findings to reach a different conclusion. The narrative discussion interpreted Dr. Savage's testimony to be that Ms. Muzzarelli would fluctuate between good days and bad days. The RFC eliminated the good day/bad day alternation and found, without explanation, that Ms. Muzzarelli could sit for four hours and stand for six hours on each work day. This RFC reverses the terms of Ms. Muzzarelli's sit/stand capacity that was proposed to the VE. It also contradicts the ME's clear testimony that Ms. Muzzarelli could stand either for four hours *or* for six hours, depending on whether she was experiencing a good day or a bad day.

We are mindful that courts should approach an ALJ's decision with common sense, and should not remand for technical errors or inconsistencies that are not determinative. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading"). At the same time, we must assess the

opinion that the ALJ actually wrote, and not one that he might have written. *See Jelinek v. Astrue*, — F.3d —, No. 10-3340, 2011 WL 5319852, at *5 (7th Cir. Nov. 7, 2011) ("We limit our review to the reasons articulated by the ALJ in the written decision"). Thus, these mutually-exclusive variations in the ALJ's understanding of Dr. Savage's testimony are not immaterial inconsistencies, but strike at the core of his determination that Ms. Muzzarelli is not disabled. By contradicting the ME's opinion on Ms. Muzzarelli's ability to stand, and by ignoring the ME's assumption that Ms. Muzzarelli would have good and bad days, the ALJ essentially eliminated Dr. Savage's opinion as a basis for the RFC. The ME never testified that Ms. Muzzarelli could sit for four hours and stand for six hours on any given day, much less that she could do so on every work day. Instead of explaining how the RFC conformed with the medical expert's opinion, the ALJ created a hybrid RFC that combined one of the ME's bad day restrictions (sitting for four hours) with a good day restriction (standing for six hours) without explaining the basis for his decision, or even recognizing that he had done so. As such, the ALJ impermissibly "played doctor" by using on his own judgment without relying on any part of the record or on the medical expert's testimony. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating that an ALJ is strictly prohibited from substituting his own judgment for that of a medical expert); *Bailey v. Barnhart*, 473 F. Supp.2d 822, 839 (N.D. Ill. 2006) (finding that an ALJ who creates a RFC without supporting medical evidence plays doctor).

SSR 96-8p states that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. Here, the ALJ may have believed he was adopting the medical source, but failed to recognize that he reached a different conclusion on RFC than the one described as belonging to Dr. Savage. Thus, remand is

required so that the ALJ can resolve his conflicting versions of Dr. Savage's testimony and clarify what record evidence supports the RFC assessment.[22]

### 3.

Ms. Muzzarelli also contends the ALJ failed to discuss how she would be able to carry out work activities at a reduced light level for a sustained period of time. SSR 96-8p requires an ALJ to provide a narrative discussion concerning a claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)." SSR 96-8p. RFC is itself an assessment of this capacity, as it measures "an individual's ability to do sustained work-related physical and mental activities in a work setting" for an eight-hour day. *Id.* As a result, courts have concluded that an ALJ's discussion that properly supports a RFC assessment satisfies SSR 96-8p's narrative requirement. *See Morphew v. Apfel*, No. IP 99-655, 2000 WL 682661, at *3-4 (S.D. Ind. Feb. 15, 2000).

The problems with the RFC discussed above lead us to conclude that the ALJ's decision does not meet this standard. SSR 96-8p requires a discussion of both "physical and mental activities in a work setting," SSR 96-8p, and the ALJ did not indicate that he considered the effect of Ms. Muzzarelli's mental limitations found at Step 2, or their aggregate effect when combined with her severe impairments. In addition, the ALJ's RFC assessment did not take account of Dr. Savage's testimony that Ms. Muzzarelli's abilities would fluctuate depending on whether she was having a

---

[22] On remand, the ALJ shall also clarify the basis for his RFC finding concerning Ms. Muzzarelli's ability to lift. The ALJ found that she could lift ten pounds occasionally (R. 19). In his summary of Dr. Savage's testimony, however, the ALJ stated that the ME believed that she could lift that amount on a bad day, but that she could lift up to twenty pounds on a good day (R. 30). In fact, this was not Dr. Savage's testimony. He stated: "[T]he record informs me that she could lift ten frequently and twenty occasionally, but I would say on good days and on bad days it would be up to ten, period" (R. 107).

"good day" or a "bad day." The ME clearly stated that Ms. Muzzarelli's ability to stand would be limited to four hours on one of her bad days, and the ALJ was obligated to explain how she could carry out such activity for eight hours a day, five days a week. *See Brown v. Barnhart*, 298 F. Supp.2d 773, 795 (E.D. Wis. 2004) ("Because the ability to work includes the ability to do sustained work activities on a regular and continuing basis, SSR 96-8p, plaintiff's alleged inability to function on certain days should have been considered."). For this reason, remand is necessary to clarify Ms. Muzzarelli's ability to work, in accordance with the requirements stated in SSR 96-8p.

## F.

At Step 5, the ALJ asked the VE to consider three possible scenarios concerning Ms. Muzzarelli's ability to work. The first assumed the capacity to perform the full range of light work, and the third presumed that her subjective claims about her limitations were fully credible. Ms. Muzzarelli does not object to these questions, but she does take issue with the ALJ's second hypothetical. This question asked the VE to assume the limitations allegedly described by Dr. Savage as being present on one of Ms. Muzzarelli's bad days. The ALJ described these limits to the VE as including the ability to stand for four hours a day and to sit for up to six hours (R. 114). The VE testified that Ms. Muzzarelli could not perform her past relevant work under this scenario, although she could perform other work that existed in substantial numbers in the Chicago area (R. 115-116). Ms. Muzzarelli argues that the ALJ erred by characterizing her exertional limit to the VE and by not including the non-exertional mental health restrictions discussed earlier in the hypothetical question.[23]

---

[23] We do not address the second of these objections, as it is not clear at this point if the ALJ incorporated the mild Step 2 restrictions into the RFC. If the ALJ determines on remand that these limitations should be part of the RFC, he will be obligated to account for them in his questions to the VE. *See Jelinek*, — F.3d —, 2011 WL 5319852, at *7-8

When eliciting testimony by means of questions posed to the VE, an "ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt*, 496 F.3d at 846; *see also Hodges v. Barnhart*, 509 F. Supp.2d 726, 736 (N.D. Ill. 2007) ("When an ALJ poses a hypothetical question to a VE, the question must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record."). An ALJ's questions do not necessarily have to take into account every possible limitation a claimant has; they need only be supported by the medical evidence in the record. *See, e.g., Ragsdale v. Shalala*, 53 F.3d 816, 818 (7th Cir. 1995); *Ehrhart v. Sec. of Health and Human Services*, 969 F.2d 534, 540 (7th Cir. 1992).

The ALJ's second hypothetical question does not meet this standard because it did not include the limitations that were later made part of Ms. Muzzarelli's RFC: it failed to ask the VE what work Ms. Muzzarelli could perform if she could sit for four hours and stand for six hours. On remand, the ALJ shall ask the VE about what work Ms. Muzzarelli can perform given all the limitations that the ALJ finds are supported by the medical record, including any mental health limitations that the ALJ may determine restrict Ms. Muzzarelli's ability to work.

---

("We have stated repeatedly that ALJs must provide vocational experts with a complete picture of a claimant's [RFC], and vocational experts must consider deficiencies of concentration, persistence, and pace") (internal quotes and citation omitted).

## CONCLUSION

For all foregoing reasons, plaintiff's motion for summary judgment (doc. #20) is granted in part and denied in part, and the Commissioner's cross-motion for summary judgment (doc. #25) is denied. The case is remanded for further proceedings consistent with this ruling. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: November 18, 2011